UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JUAN THOMAS WILKINSON, | ) | 1:09-cv-01672-JLT HC |
| Petitioner, | ) ) ) | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1) |
| v. | ) ) | ORDER DIRECTING CLERK OF COURT TO |
| HEDGPETH, Warden, | ) ) | ENTER JUDGMENT AND CLOSE CASE |
| Respondent. | ) ) ) | ORDER DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 7, 2009, Petitioner filed his written consent to the jurisdiction of the United States Magistrate Judge for all purposes. (Doc. 8). On April 28, 2010, Respondent Petitioner filed her written consent to the jurisdiction of the United States Magistrate Judge for all purposes. (Doc. 19).

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation ("CDCR") serving a determinate sentence of twelve years and six months, pursuant to a judgment of the Superior Court of California, County of Madera (the "Superior Court"). (Doc. 20, Lodged Documents ("LD") 1). On August 2, 2007, Petitioner was convicted by jury of, inter alia, attempted voluntary manslaughter. (Clerk's Transcript on Appeal ("CT"), page 90-97).

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth

Appellate District (the "5th DCA"), which, in an unpublished decision, affirmed Petitioner's conviction. (LD 1). On October 23, 2008, Petitioner filed a petition for review in the California Supreme Court. (LD 2). On December 10, 2008, the state supreme court denied Petitioner's petition for review. (LD 3).

Respondent concedes that the sole ground for relief in the petition has been fully exhausted. (Doc. 18, p. 6).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision:

On the evening of January 30, 2007, Donnie Cribbs was in his second-floor apartment in Madera. He had gotten up early to go recycling, then had been drinking since about 11:00 a.m. Ernie, who rented Donnie's garage, had left around 7:00 a.m. and had not come back that day. Rick, who rented a room from Donnie, had also left in the morning to go recycling.

Early in the evening, at about 7:00 or 8:00 p.m., Domingo came by and asked Donnie if defendant had been there. Domingo said, "'Oh. Well, I just wanted to make sure that he wasn't going to mess with you.'" Then Domingo left.

Later, Donnie and another friend were drinking and listening to music. Donnie ran out of beer and his friend left. Donnie had a knife on the arm of his couch because he was cutting and eating lemons.

Just before 10:00 p.m., defendant opened the door and entered with a half-gallon bottle of Jim Beam whiskey. Defendant said, "'Hey, what's up, Donnie? I got a bottle of Jim Beam. I stole it from [Longs].'" Defendant was very friendly, just as he was on any other day. Defendant was one of Donnie's best friends. Donnie was good to him and sometimes let him stay at his apartment. Donnie noticed that defendant smelled of methamphetamine. Donnie thought defendant was intoxicated and high. He described defendant as "pretty wasted that night," and acting "really cool." Defendant leaned forward slightly when he walked in the door. His eyes were baggy and his mouth was slack. Donnie though he was "definitely loaded."

Defendant gave Donnie a few shots of his whiskey. Defendant asked Donnie if he had $2 so he could buy himself some drugs. Donnie refused, saying, "'I ain't got it. And furthermore,...I wouldn't give you money for stuff like that.'"

They drank and conversed for about 20 minutes. They talked, joked and laughed. Even though defendant was under the influence, he was able to function, understand and converse. He did not lose his balance or fall down.

Then defendant went into the kitchen to get a glass of water to chase his whiskey. They had drunk very little of the whiskey. When defendant returned, he came up from behind Donnie with the knife, put his arm around Donnie's throat and stabbed him repeatedly in the neck and chin. When Donnie tried to reach behind and get the knife away, defendant sliced his wrist and told him, "'You're–you're already dead, Donnie.'" Then he stabbed Donnie again. Donnie was not able to defend himself at all. He could not move or bend because of the way defendant was holding him.

|   |   |
|---|---|
| 1 | Donnie was afraid and he knew that if he stayed in the apartment, defendant would kill him. He knew he needed to get outside where he might find a witness. But defendant kept his arm around Donnie and would not let go. Nevertheless, Donnie left the apartment with defendant holding onto him. Donnie went down the stairs, dragging defendant with him, until he reached the apartment window of Brenda, the apartment manager. Defendant still had Donnie in a chokehold with his body pressed up to him. Donnie tried to yell for help at the window, but the air was escaping through his stab wounds. When he tried to say, "'Help, Brenda,'" Brenda's husband, Gustavo, turned around and saw them. At that moment, defendant froze and dropped the knife. Defendant had a cold, evil look in his eyes, as though he was going to kill someone and Donnie was lucky to get away. Defendant took off down the alley. |

According to Bibiana, Brenda and Gustavo's 12-year-old daughter, she came into the apartment's living room where Gustavo was watching television. Brenda was washing dishes. Bibiana saw Donnie pushed up against their apartment window with defendant behind him. Donnie yelled Brenda's name two or three times. His hand smeared blood on the window. After about three seconds, Donnie fell onto the grass in front of the apartment and defendant got on top of him and struck him two or three times. Bibiana could see them through the security screen door, but it was too dark for her to tell whether defendant had anything in his hand. Bibiana thought defendant looked angry and firece; he did not want to stop attacking Donnie. But when Gustavo opened the door, defendant ran away. Brenda called the police. Donnie was holding his neck and coughing up blood.

Gustavo remembered that he was watching television when he heard an argument outside. He heard someone say something like, "'Leave me alone,'" and "'help.'" Gustavo opened the door but left the security screen door locked. Gustavo saw Donnie and defendant, one in front of the other, arguing. Gustavo got the telephone and continued to watch through the window as he called the police. Donnie tried to open the security door and yelled, "'He's trying to kill me,' and, 'He slit my throat.'" Defendant had his arms wrapped around Donnie's head and chest and they were struggling. Defendant was swinging at Donnie, but Gustavo could not tell if defendant had anything in his hands. Gustavo approached the security door and yelled that he had called the police. At that point, defendant stopped attacking Donnie and walked away.

Police Officer Paul responded to the call. When she approached, she found Donnie in a squatting position with his hands around his throat. He was bleeding severely and was unable to speak. Bubbles were emanating from his injuries. Immediately next to Donnie was a butcher knife with an eight-inch blade covered in blood. The officer applied a towel and pressure to Donnie's injuries and he was then able to tell her who had harmed him. Gustavo gave the police a description of defendant.

After Donnie left in an ambulance, the officer went to Donnie's apartment. There was blood on the stairway leading to the apartment and in various places inside the apartment. On the outside wall of the manager's apartment, the officer found a bloody handprint and there was blood on the doorknob, as though someone had tried to open the door.

An hour or an hour and one-half later, other officers located defendant outside a residence a block or two away. The police set up a perimeter and broke through the yard's fence. They yelled at defendant to stop, but he refused and attempted to enter the house. He refused to show his hands, so an officer subdued him with her taser and handcuffed him.

Once defendant was handcuffed, he remained very upset and angry. Unsolicited, he yelled, "'I stabbed that motherfucker, that child molester motherfucker.'" The officer patted him down and found a glass pipe with white residue in his pocket. When the officer removed it and held it up, defendant said, "'It's a meth pipe.'" Then he yelled, again angrily and

spontaneously, "'Is that motherfucker dead? If he's not, when I get out, I'm going to kill him."

Defendant had a very small cut on his left hand and his clothing was covered with blood.

Dr. Bilello, a trauma surgeon, performed surgery on Donnie after he had undergoing emergency surgery to stop the bleeding and ensure an airway. One of Donnie's wounds penetrated almost halfway through his neck. Dr. Bilello explained at trial that the wounds required a significant amount of force to penetrate as far as they did.

The day after the stabbing, Officer Sauceda attempted to obtain information from Donnie at the hospital, but he was unable to speak. The officer waited until February 12 to speak to Donnie because she was told he was sedated and not in a condition to communicate until then. That day, Donnie told the officer he and defendant had been alone in his apartment. Donnie did not drink any whiskey and they did not argue. Donnie kept the knife on the back of his couch for protection because he lived in a bad neighborhood. Donnie told defendant he was going to bed and he walked from the kitchen to the living room, at which point defendant jumped up from the couch, rushed toward him and began stabbing at his neck.

When asked at trial to describe defendant's demeanor and conduct that night, Donnie said defendant was acting like "his mind was taken over" or he was out of his mind because otherwise he would not try to kill a friend. Donnie explained defendant's mental state as follows: "But no, I think it's not a matter of him being all there. I think he was just–just some cruel, cold, mean thoughts came into his mind. And he was aware of the thoughts and he followed through on them." Donnie previously had said it was like defendant "'blacked out.'" He explained that he meant defendant was not in the "right state of mind." Donnie meant that defendant thought he was going to kill Donnie and he followed through on that thought. Defendant was so under the influence that he just "wasn't in the right frame of mind." He was "loaded on drugs and...he had the intent to kill and he tried to follow through on it." "It definitely seemed like...something else had stepped into him." Donnie thought the drugs were probably controlling him. Donnie explained that his prior use of the word "zombie" only referred to defendant's droopy eyes, not the way he was acting. Donnie could not say that defendant was not himself when he stabbed him. Donnie said, "It wasn't like him to do that, but he did. So it doesn't excuse, you know, what he did...."

Donnie had not threatened defendant in any way and he had not been angry with defendant. They had never been in a situation where they wanted to fight. Donnie had not ingested any methamphetamine that day, but he had smoked some marijuana. Donnie could think of absolutely no reason for defendant to stab him.

On cross-examination, Donnie agreed that he had considered defendant a "very, very good friend." They had known each other about one year seven months before the incident. About three months after they met, Donnie told defendant that he had been convicted for having sexual relations with a 14- or 15-year-old girl. Defendant did not express any anger toward Donnie on that topic. He was a "little bit argumentative," but "then after that he pretty much just let it go." That conversation occurred one and one-half years before the incident.

*Defense Evidence*

Ernie lived in Donnie's garage for two or three months. Ernie had also known defendant for several years. Ernie was in Donnie's apartment the day of the stabbing. He arrived at Donnie's at about 6:00 p.m. and he stayed for three or four hours. Donnie's other roommate, Rick, was also there. He was asleep in the bedroom. Defendant was already there or he came later. Donnie's apartment was a place where everyone gathered and drank together.

Ernie could tell that Donnie and defendant were getting drunk that evening. Defendant and Ernie were smoking methamphetamine with Rick in his room. Defendant was drinking malt liquor, as he typically did. Everyone was getting along. Ernie decided to leave around 10:00 p.m. when there was a "ruckus going on." He left and walked toward Burger King, but before he got there he saw defendant and Donnie in the alley near the apartment. Ernie saw defendant and Donnie go their separate ways. Ernie met a friend at Burger King and, within 10 minutes or so, he saw police cars and emergency vehicles swarming the area near the apartment. Ernie did not go back to the apartment that evening because he was on probation and did not want contact with the police. From a nearby park, Ernie saw Domingo's car being towed away from the apartment area. Ernie went back the next morning, but Rick would not let him in.

On cross-examination, Ernie admitted he had used heroin that night.

(LD 1, pp. 3-8).

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Madera County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant proceedings were initiated by the filing of the original petition on September 1, 2009, after the enactment of the AEDPA, and thus this case is governed by the AEDPA.

### II. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

The first prong of federal habeas review involves the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1). This prong pertains to questions of law and mixed questions of law and fact. Williams v. Taylor, 529 U.S. at 407-410; Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004). A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405. A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 1388 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 562 U.S. ___, 131 S.Ct. at ___ (slip op. at 12-13)(quoting Jackson v. Virginia, 443 U.S. 307,

1  332, n. 5 (1979)(Stevens, J., concurring).  The Supreme Court has "said time and again that 'an
2  *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"
3  Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of
4  habeas corpus from a federal court "must show that the state court's ruling on the claim being
5  presented in federal court was so lacking in justification that there was an error well understood and
6  comprehended in existing law beyond any possibility of fairminded disagreement."  Richter, 562
7  U.S. ___, 131 S.Ct. at ___(slip op. at 13).

8  Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the
9  state court that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1398 ("This backward-
10 looking language requires an examination of the state-court decision at the time it was made.  It
11 follows that the record under review is limited to the record in existence at the same time–i.e., the
12 record before the state court.")

13 The second prong of federal habeas review involves the "unreasonable determination" clause
14 of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.
15 Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under
16 § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's
17 claims "resulted in a decision that was based on an unreasonable determination of the facts in light of
18 the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v.
19 Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible,
20 thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").
21 A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be
22 debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.
23 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

24 The AEDPA also requires that considerable deference be given to a state court's factual
25 findings.  "Factual determinations by state courts are presumed correct absent clear and convincing
26 evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and
27 based on a factual determination will not be overturned on factual grounds unless objectively
28 unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-

El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."   Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where, as here, a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

///

///

**III.  Review of Petitioner's Claim.**

G**round One   Petitioner was not denied his Sixth Amendment right to the effective assistance of trial counsel.**

The instant petition alleges as its sole ground for relief that the representation by Petitioner's trial counsel, was constitutionally deficient.  In particular, Petitioner argues that counsel's representation was deficient due to his failure to argue to the jury the intoxication defense despite that there was evidence of intoxication and despite that the jury was instructed on intoxication as a defense to specific intent.  By implication, Petitioner alleges also that counsel's representation was ineffective based upon the attorney's to pursue a defense of unconsciousness but failing to request a jury instruction related to the unconsciousness defense.   For the reasons set forth below, the court concludes that the adjudication of this claim in the state court was neither contrary to nor an unreasonable application of clearly established federal law.

**A.  Proceedings In State Court**.

The 5th DCA's opinion explains the procedural context for Petitioner's ineffective assistance of counsel claim as follows:

> Defendant contends defense counsel provided ineffective assistance during closing argument because he failed to argue an intoxication theory when there was evidence of intoxication and the court instructed on intoxication as it applied to specific intent.  Defense counsel instead argued an unconsciousness theory, based not on intoxication but an unspecified cause.  We conclude any deficiency was harmless.
>
> ...
>
> During defense counsel's opening statement, he described the case as "a stabbing that occurred during an extremely drunken night of several friends."  He also explained:
>
>> "What we have it two drunks—I would say toxic, drinking-themselves-to-death alcoholics—fighting or arguing over a bottle of whiskey. Danny told [defendant], 'You can't have anymore.' [Defendant] wanted to leave. Donnie threatened [defendant], saying 'I'll kick your ass.' ... [¶] The evidence will show that in Donnie's own words, [defendant] just within seconds, his mind was taken over as if by a demon. He described [defendant] as blacking out. He said—he will tell you that [defendant] was unconscious at the time of the stabbing. Unconscious. Now, he will tell you that [defendant] blacked out as though he was taken over by another person, that [defendant] blacked out. [¶] The evidence will show that [defendant] was in and out of consciousness that night and was, in the words of the People's witness—the star witness in this case, the witness who was there—that [defendant], his very, very good friend, was unconscious at the time of the stabbing. There was no intent to kill. There was no real intent to stab. [¶] ... [¶] But the evidence will show from Donnie['s] own mouth that they were very, very good friends, but [defendant's] mind was

taken—just within seconds, was taken over as if by a demon for real... [¶] ...{¶] I think the evidence will show that [defendant] got a very small cut or very small wound that night, appears to be a defensive wound, and that [defendant] at some point got the knife, blacked out, completely blacked out as though—as though he was taken over as if by a demon, as if he was taken over by another personality,, and was unconscious and stabbed Donnie."

At one point during trial, defense counsel argued for admission of certain prior statements by Donnie. Counsel said, "And this is absolutely the defendant's defense of the case of unconsciousness. Donnie is the witness to unconsciousness. He testified here he did not want to be a witness to unconsciousness and told us a tale of [defendant's] deceiving him, uh, and coming in, intending to kill him."

During closing argument, defense counsel conceded there was indisputable evidence that defendant stabbed Donnie, but the issue was defendant's mental state at the time he did so. Counsel pointed out that Donnie and defendant were good friends and drinking buddies. Defendant was not angry that Donnie was a sex criminal. Indeed, defendant had no reason to hurt Donnie. But all of a sudden, defendant's mind was "[t]aken over by a demon." Defense counsel continued:

"[Defendant's] personality wasn't there. It is as though he was blank and operating under the influence of something else...It's like he blacked out. We understand what blacking out means. It means you are unconscious, you are not aware, you are not doing things intentionally, you don't have an intent in your head. You are blacked out. [¶] ... [¶].

"Donnie is a very interesting person and a very interesting witness. Like most witnesses, he gets more sure of himself and his testimony improves a little bit with time. [¶] But I submit what he told my investigator and what he told you about [defendant's] intent, that he didn't have any, that he was blank. Again, Donnie told us it's like [defendant] was a zombie. That's another phrase that's very easily understood. Zombie in the trivial sense is the walking dead. But what it means is the body is moving and the mind isn't there. That's what the meaning of the word is. [¶] ...[¶]

"...Donnie does [know defendant] all too well. And he knows him well enough to be in a position to say that [defendant] blanked out. He knows [defendant's] personality. They were drinking buddies for a long time. These aren't strangers. They were very, very good friends. So Donnie knows what he's talking about. He knows [defendant] all too well.

"So when [Donnie] says [defendant] blanked out, he was a zombie, and automaton, he knows it, he knows what he's saying and he means it. And really the zombie language came up yesterday. That was Donnie's words. Donnie tried to backtrack and say, well, the guy really had this intent to kill and he was a false friend who apparently came in the door planning on killing him. Well, for one thing there were people there, not just [defendant] and Donnie and some other guy who came and went. Rick was there. Ernie was there. The usual drinking crowd was there. Not the world's best place for a murder.

"And, again, Donnie said it came out of the blue. [¶]...]¶]

"Donnie is not the most reliable person in the world. I will accept what he gives me. But when yesterday he tried to backtrack and talk about how [defendant] intentionally

was trying to kill him, that's not what he said a week afterwards when he said [defendant] was blank as if taken over by a demon. Yesterday in court he was going on and on...[¶]...[¶]

"...And what we have is the testimony of Donnie who is the heart and [soul] of this case. The eyewitness. The man who was there. The man who has no reason to lie. The man with the stab wounds. Who said then and who said now that they were very, very good friends. But [defendant's] mind was just within seconds taken over. That it's like he blacked out and someone is in control of him.

"And Donnie expanded on this yesterday and said [defendant] was a zombie. And then Donnie backtracked and said, well, that means droopy eyes. Well, there is a little more to being a zombie than having droopy eyes. It's not a wardrobe malfunction. A zombie is someone who is moving[,] who is unconscious, who[se] body is moving and the mind and intent are not there. And again, this is not from me. This is not from some expert. This is straight from Donnie, straight from the horse's mouth.

"And I'd ask you to believe him. Okay. It's perhaps a little unusual that a defense attorney asks a juror, a trier of facts, to believe the victim. But here we are and that's what we have.

"I'd ask you to apply the Court's instructions to the facts that you have. What we have is [defendant] blanked out, acting a zombie, moving without intent, without motive, without reason, snapped and this happened. He wasn't aware of what he was doing. He had no intent to kill. He had no intent to commit great bodily injury. The use—ordinarily looking at the facts, one person stabs another, it's pretty obvious what they are doing. And that, of course, is the People's argument. Unfortunately for the People, we have the testimony of Donnie that that's not what was going on that night. [¶] [Defendant's] body was moving. His personality that Donnie knew all too well wasn't there. Wasn't there. The intent, the awareness, the ability to focus an intention wasn't there. There is no intent to kill. There was no intent to do great bodily unjury. There wasn't any intent at all. No awareness. And that proven beyond a reasonable doubt by the testimony of Donnie. That's what we have.

"This is one of the strangest cases you are ever likely to see. And it gets even more peculiar. Because we—I am not arguing that [defendant] was mindless due to voluntary intoxication. He wasn't passed out. No other witnesses have him passed out. He wasn't out of it due to voluntary intoxication. And that's not what Donnie described. What Donnie describes is someone who was blank, who acted as though he was under the control of something else or some strange force who is being a zombie. We don't have testimony from Donnie that [defendant] took one last hit and went crazy. That isn't what we have. That isn't what we have. That would be voluntary intoxication. What we have is maybe the strangest set of facts you are ever likely to see in a courtroom. But that's what we do have. And the People have proven it beyond a reasonable doubt from the testimony of their witness. And I'd ask you to accept Donnie for what he said and for being correct. He was there and he knows..

"Thank you very much."

As these passages demonstrate, rather than arguing that defendant lacked the intent to kill (or to inflict great bodily injury) because he was intoxicated, counsel argued that defendant lacked intent because he snapped, blacked out, blanked out, was like a zombie, was moving but unconscious, was unaware, was under the control of someone or something else, and had lost his personality. Defense counsel did not request instruction on unconsciousness caused

by a blackout or other involuntary cause....

(LD 1, pp. 8-12).

The 5th DCA then explained that, under California law, unconsciousness due to an involuntary cause, unlike voluntary intoxication, was potentially a complete defense to all of the crimes for which Petitioner was charged. (LD 1, p. 13, fn. 3). This was because, in California, someone who is rendered unconscious due to, e.g., epilepsy or the unknowing consumption of a "spiked" drink, is not held legally responsible for crimes he commits in that unconscious state. (Id.). Effectively, under state law, an unconscious person is "incapable" of committing a crime. (Id.).

After noting that pursuing such a complete defense could have been a tactical choice by defense counsel, the 5th DCA went on to reason as follows:

> Even if we assume counsel's approach was deficient rather than tactical, we cannot conclude that it prejudiced defendant. As defense counsel acknowledged, the only issue in this case was defendant's mental state. The evidence that defendant intended to kill Donnie was overwhelming. Defendant's intent was established by his violent, repeated stabbing deep into Donnie's neck; his "you're already dead, Donnie" statement; his unrelenting pursuit and continuing attack as Donnie attempted to flee, dragging defendant with him; and, most notably, his emphatic statements of intent made to the police more than an hour and one-half after the stabbing, when he said he had "stabbed that motherfucker, that child molester motherfucker," inquired whether he had killed "that motherfucker," and asserted that, if he had not, he would kill him when he got out. In light of this evidence, it is inconceivable that a reasonable jury would conclude that defendant did not intend to kill Donnie. Furthermore, there was no evidence that defendant was unconscious of his acts and therefore unable to act with volition or intent. He was able to function, converse and joke. He walked without losing his balance or falling down. He told Donnie he was "already dead." He tenaciously pursued and attacked Donnie until he realized there was a witness to his attack and the police had been summoned, at which point he fled the scene, evaded the police and spontaneously informed them he hoped he had killed Donnie. This scenario does not even remotely suggest defendant was unconscious of what he was doing. Whatever motivated him to act (the jury apparently determined it was passion), the evidence overwhelmingly established that he was perfectly aware of his actions and he engaged in them with the express intent to kill Donnie.
>
> We conclude that defense counsel's failure to argue an intoxication theory (or request an unconsciousness instruction) was harmless because there is no reasonable probability such an argument (or instruction) would have changed the result of the proceeding. Having found no prejudice, we need not address whether the performance of counsel was deficient.

(LD 1, pp. 13-14).

**B. The Standard For Ineffective Assistance of Counsel.**

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective

assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

With these principles in mind, the Court now turns to an analysis of Petitioner's claim of

1  ineffective assistance of trial counsel.

2        **C. Petitioner Was Not Denied the Effective Assistance of Counsel**.

3        As a preliminary matter, the Court notes that, in the last reasoned state court decision. i.e., the

4  5th DCA, the state court did not decide the first prong of the <u>Strickland</u> test—whether counsel's

5  performance was deficient.  Rather, the state court held that, even if counsel's performance were

6  deficient, no prejudice had been established under the second <u>Strickland</u> prong and therefore the

7  claim should be rejected.  Where, as here, the state court does not rule on part of all of a federal

8  standard, this Court reviews the state court analysis de novo rather than under the more deferential

9  AEDPA standard.  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002)(holding that "when it is

10  clear that a state court has not reached the merits of a properly raised issue," the federal habeas court

11  must review it de novo).  Accordingly, since the state court did not determine whether counsel's

12  performance was deficient, this Court will address that issue de novo.

13        1. <u>Deficient Performance</u>.

14        Counsel's failure to "emphasize" the intoxication defense in his closing argument was not, in

15  the Court's view, deficient.  Clearly, in light of the excerpt of the closing argument quoted above,

16  defense counsel had decided to argue unconsciousness, a complete defense to all charges, rather than

17  voluntary intoxication, which would have left Petitioner without a defense to the assault charge.

18  This tactical decision necessarily involved a trade-off: if the defense pursued voluntary intoxication,

19  then Petitioner would likely have been convicted of assault even if the jury found he lacked the

20  requisite intent for the other charged crimes.  If the defense pursued the weaker unconsciousness as a

21  complete defense, the chances of persuading the jury were lessened but, if successful, would result in

22  an acquittal on all charges.

23        Thus, rather than argue intoxication, for which there was ample evidence of consumption but

24  only inferential, i.e., non-scientific and non-expert, evidence of intoxication, counsel chose to pursue

25  a defense for which the primary evidence was the testimony of the victim himself, i.e., that Petitioner

26  acted like a "zombie."  Clearly, counsel hoped that in using the victim's own description of Petitioner

27  as the main evidence of the defense of unconsciousness, he would find a more receptive audience for

28  what was, by any description, a brutal and seemingly unprovoked attack on the victim. Although it is

easy to second-guess defense counsel's tactical choice in light of what we know now, the Court cannot conclude that defense counsel's decision to employ a defense that would, if persuasive, result in an acquittal on all, rather than most, charges, fell below an objective standard of reasonableness.

Moreover, evidence was elicited at trial that Petitioner had been drinking and the jury was properly instructed on voluntary intoxication. Thus, had the jury been convinced beyond a reasonable doubt that Petitioner was intoxicated, it could still have found Petitioner not guilty of all but the assault charge. It is doubtful that had counsel decided to press the intoxication defense in closing argument, would have had a significant impact on the jury's decision one way or the other. Rather, it is far more likely that, as the 5th DCA found, the jury rejected the intoxication defense because the evidence of intoxication sufficient to negate intent was de minimis and the evidence of Petitioner's intent to kill the victim was overwhelming. Accordingly, the Court does not find that trial counsel's performance was deficient for failure to emphasize the intoxication defense in closing.

Regarding counsel's choice of unconsciousness as a defense strategy, the Court is understandably hesitant to second-guess trial counsel's tactical choices. However, having made such a tactical choice, it seems clear that a reasonable defense attorney would have then requested a jury instruction on the specific defense he has chosen. See United States v. Span, 75 F.3d 1383, 1387 (9th Cir. 1996)(holding that counsel's performance may be constitutionally deficient if counsel fails to request appropriate jury instructions, including lesser included offense instructions). A defense counsel's performance is not constitutionally ineffective if he or she, "with adequate knowledge of the law and the evidence," chooses not to request an instruction as long as such a choice is reasonable. Butcher v. Marquez, 758 F.2d 373, 376-377 (9th Cir. 1985). However, merely labeling such a choice "trial strategy" does not automatically immunize an attorney's performance from Sixth Amendment challenges. Span, 75 F.3d at 1389. Counsel's performance is deficient if "[c]ounsel's errors with the jury instructions were not a strategic decision to forego one defense in favor of another" but "the result of a misunderstanding of the law." Id. at 1390.

Here, it appears that trial counsel's failure to request an unconsciousness instruction after having determined to pursue a defense based on unconsciousness was not a tactical decision, but an oversight. Whether such an instruction would be inconsistent with an intoxication defense is

irrelevant here, since defense counsel clearly chose not to pursue intoxication as a defense. Thus, the only explanation for counsel's failure to request an instruction on unconsciousness is either inadvertence or ignorance of the law. In the Court's view, once counsel committed to a defense of unconsciousness, as opposed to voluntary intoxication, he had the duty, as a reasonable attorney, to request that the jury be properly instructed as to the legal consequences of such a defense if the jury should believe it. Without such an instruction, counsel's chosen defense would be effectively doomed. Put another way, trial counsel's failure to request an instruction on his chosen defense would have severely limited any chances the defense had that jurors, even if persuaded by the evidence of Petitioner's unconsciousness, would have had adequate legal instruction that would allow it to arrive at a more favorable verdict.

In light of the foregoing, and even indulging in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, it appears that defense counsel's failure to request an instruction on his own theory of the defense fell below the standard of reasonableness required by the Sixth Amendment, as construed in Strickland.

        2. Prejudice.

As mentioned, the 5th DCA's opinion addressed the second prong of Strickland, i.e., prejudice, and ruled that Petitioner was not prejudiced by counsel's failure to assert a defense of intoxication since there was overwhelming evidence that Petitioner possessed the requisite intent to kill the victim required by California law. Accordingly, this Court is bound by the more deferential AEDPA standard of review regarding this issue. Also as mentioned, this Court must therefore be doubly deferential, i.e., the Court must be convinced not only that the state court's adjudication was wrong but that it was objectively unreasonable in determining that Petitioner was not prejudiced by his counsel's actions. Yarborough, 540 U.S. at 5. For the reasons discussed below, the Court agrees with the state court's determination that Petitioner was not prejudiced by counsel's actions.

Under Strickland, to demonstrate prejudice, Petitioner must show that it is reasonably probable that the outcome of his trial would have been different had counsel more emphatically emphasized voluntary intoxication as a defense and had argued it to the jury in his closing argument. Strickland, 466 U.S. at 694. "A reasonable probability does not mean that we must determine that

the jury more likely than not would have returned a verdict for something beside [sic] first degree murder, but only that [defendant] has shown a 'probability sufficient to undermine confidence in the outcome.'" Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002), *quoting* Strickland, 466 U.S. at 694.  Thus, Petitioner must demonstrate that it was objectively unreasonable for the state court to conclude that his counsel's failure to argue voluntary intoxication in closing argument did not affect, or otherwise undermine confidence in, the outcome of Petitioner's trial.

Even assuming, arguendo, that counsel's failure to emphasize the voluntary intoxication defense in closing argument was constitutionally deficient, and while the failure to assert a specific defense may, in certain circumstances, result in prejudice, e.g., Seidel v. Merkle, 146 F.3d 750, 757 (9th Cir. 1998)(finding prejudice where counsel completely failed to investigate his client's mental health despite abundant signs in the record that his client suffered from mental illness): Jennings, 290 F. 3d at 1019 (finding prejudice where counsel failed to investigate and prepare a mental health defense, noting that the jury deliberated for two full days despite overwhelming evidence against defendant), Petitioner has not demonstrated that the state court's adjudication to the contrary was objectively unreasonable.

As the 5th DCA noted, the only disputed point in the case was Petitioner's mental state.  The evidence of Petitioner's intent to kill the victim as well as the lack of either intoxication or unconsciousness sufficient to negate that intent was virtually non-existent: Petitioner made repeated statements both to the victim at the time of the attack and also to police later upon his apprehension that he intended to and wanted to kill the victim; Petitioner continued his assault on the victim and pursued his attack with great perseverance; the viciousness with which Petitioner stabbed the victim suggests intent; Petitioner's ability to flee the scene when the police arrived shows both consciousness of guilt as well as his physical and mental ability to effect an escape; Petitioner's ability to joke and converse immediately before and during the assault shows awareness of what he was doing; and, finally, the lack of evidence of any objective signs of intoxication, such as staggering, lacking the ability to maintain his balance, or otherwise acting in an inebriated or unconscious manner during the assault, all refute the assertion that Petitioner was so intoxicated or unconscious that he could not form the requisite intent.

Regarding counsel's failure to request an instruction related to the unconsciousness defense, in addition to the points discussed above, it is important to note that trial counsel obviously felt it was an advantage for the defense to base its unconsciousness defense on the very words of the victim.  Indeed, trial counsel, in his closing argument, repeatedly reminded the jury that the defense was based on Donnie's *own* description of Petitioner acting like a "zombie," the he "blanked" out, that he "blacked" out, that he was moving but unconscious, that he had lost his personality, and that he acted like he was under the control of someone else.  Without question, a defense that can rely upon the main prosecution witness's testimony for its support has an advantage over mere inference or testimony solely from the accused.

The terms used by the victim, however, to describe Petitioner, e.g., "zombie" and "taken over," are not scientific terms, and defense counsel did not present any scientific evidence or expert testimony about unconsciousness, either in general or specific to this case.  Thus, the jury could, and clearly did, interpret Donnie's testimony, and the precise words he used about Petitioner acting like a zombie and as if he had been taken over by someone else, as evidence of some mental state other than unconsciousness, e.g., anger, rage, or even mere loss of self-control.  Moreover, as the 5th DCA pointedly observed, notwithstanding the victim's characterization of Petitioner, there was simply no credible evidence, other than the defense's interpretation of Donnie's own words, that Petitioner was actually unconscious during the attack.  To the contrary, for the reasons discussed previously, the evidence was overwhelming that Petitioner was both conscious and well aware of his actions during the assault.  Accordingly, the Court agrees with the 5th DCA that Petitioner was not prejudiced by counsel's failure to request an instruction on unconsciousness.

Thus, the Court finds that the state court adjudication of Petitioner's contention of ineffective assistance of trial counsel was neither contrary to nor an unreasonable application of clearly established federal law.  Accordingly, the Court will deny the petition for writ of habeas corpus.

Moreover, the Court declines to issue a certificate of appealability.  A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003).   The controlling statute in determining whether to issue a certificate of appealability is 28

U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--
>    (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court;  or
>    (B) the final order in a proceeding under section 2255.
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court DECLINES to issue a certificate of appealability.

///
///
///
///
///
///

**ORDER**

For the foregoing reasons, the Court HEREBY ORDERS as follows:

1. The petition for writ of habeas corpus (Doc. 1), is DENIED with prejudice;
2. The Clerk of the Court is DIRECTED to enter judgment and close the file;
3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **December 2, 2011**                                                   **/s/ Jennifer L. Thurston**
                                                                                                              UNITED STATES MAGISTRATE JUDGE